LOUSADA (LORWAY v.). See Case No. 8,517.

## Case No. 8,544.

### LOUTE v. ALLEGHENY COUNTY.

[10 Pittsb. Leg. J. 241; 2 Pittsb. Rep. 411.]

Circuit Court, W. D. Pennsylvania. Dec., 1862.

MANDAMUS — EFFECT OF JUDGMENT UPON FUND IN COUNTY TREASURER'S HANDS — ATTEMPTS TO EVADE JUDGMENT — CONTEMPT — WARRANTS IN PAYMENT OF TAXES.

1. Upon service of a mandamus execution upon county commissioners, as prescribed by the act of assembly of Pennsylvania of 16th April, 1834, it is their duty: (1) If there be any money in the treasurer's hands unappropriated by previous orders, to cause it to be paid to the party. (2) If there be not money enough in the treasury to satisfy the whole judgment, to pay it out of the first money received. (3) If the taxes of the current year are insufficient to pay the judgments and other expenses of the county, to assess and collect on the next year a sufficient sum for this purpose.

2. The judgment of the court is an appropriation of all the money in the treasury, not already drawn or appropriated by previous county orders in payment of previous demands audited and allowed by the controller; and also of the first money thereafter received for the use of the county.

3. The commissioners will be held guilty of contempt should they seek to evade the process of the court by dividing the funds to be collected by taxes and appropriating them before their collection.

4. After service of the mandamus execution, the treasurer has no authority to receive county orders of a subsequent date in payment of taxes.

5. The provision of the act of 1st January, 1862, requiring the treasurer of Allegheny county to receive warrants in payment of taxes, was not intended to repeal any of the provisions of the act of April, 1834, nor can it relieve the treasurer from the proper application of the county funds in the order of their appropriation as previously made.

6. It can have no retroactive effect; nor can the legislature be presumed to intend to aid public officers in an astute scheme to evade the performance of their official duties.

Rule for attachments for contempt against the county officers.

Hamilton & Acheson, for plaintiff.

R. B. Carnahan, S. H. Geyer, and J. P. Penney, for county officers.

GRIER, Circuit Justice. The plaintiff and numerous other suitors in this court obtained their several judgments against the county of Allegheny to November term, 1861, on interest coupons of the bonds of the county issued for railroad purposes. Mandamus executions, as authorized by the statute of Pennsylvania, were served on the several officers who represent the county in its corporate capacity, to wit, the commissioners, the controller and the treasurer, on the 19th of November, 1861. The act authorizing the process provides that "it shall be lawful for the court in which such judgment may be obtained to issue thereon a writ commanding the commissioners of the county to cause the amount thereof, with the interest and costs, to be paid to the party entiled to such judgment, out of any moneys unappropriated of

such county, or, if there be no such moneys, out of the first moneys that shall be received for the use of such county, and to enforce obedience to such writ by attachment."

The duty of the commissioners, on whom process under this act is served, is plainly set forth: (1) If there be any money in the treasurer's hands unappropriated by previous orders, the exigencies of this writ require that the commissioners cause it to be paid to the party. (2) If there be not money enough in the treasury to satisfy the whole judgment, it is their duty to pay it out of the first money received. (3) If the taxes of the current year are insufficient to pay the judgments and other expenses of the county, it is their duty to assess and collect on the next year a sufficient sum for this purpose. (4) The judgment of the court is an appropriation of all the money in the treasury not not already drawn or appropriated by previous county orders in payment of previous demands audited and allowed by the controller; and also of the first money thereafter received for the use of the county.

Have the commisssioners complied with the exigency of these writs? If they have not, they are guilty of a contempt of the process of the court: (1) It is admitted that they have not paid the judgments, or any part of them, according to the command of the writs. (2) They have issued orders for large sums since the service of these writs, and appropriated the money collected by taxation to other purposes, posterior in order to the appropriation made by law and the judgment of the court. (3) It is clearly shown by the answers of these officers that instead of seeking to make the appropriation required by the exigency of this process, they have been astute in contriving "how not to do it."

Instead of pursuing the straight line of duty required by the law, of including these judgments in the estimates for the next year, and assessing a general tax sufficient to discharge these and all expected demands for county purposes, they have pursued the following plan: they divide the liabilities past and prospective for the coming year, into two classes, and attempt to make a prospective appropriation of the moneys to be collected from taxes, which will exclude the precedent appropriation made by law. To effect this plan, they make an estimate of the expenses of the coming year, including interest on the funded debt intended to be paid, and lay a tax of five mills for this purpose, which is collected and paid in the usual way. Besides this, they assess another tax of twenty-seven mills, which is appropriated to pay the debt on the railroad bonds, one tax intended to be collected, and another not intended to be collected. Such intention is justly inferred, because it is the necessary consequence of this new scheme of dividing the funds to be collected by taxes, and appropriating them before their collection. The law has appropriated the first money that

shall come into the treasury to the payment of these judgments. The commissioners by this scheme have nullified the law, and set it at defiance. They have paid out large sums on orders dated since the service of the writs in these cases. The act of assembly of May 1, 1861 [Laws Pa. 1861, p. 450], relating to Allegheny county, provides for the appointment of a controller, and defines his duties. Among others: "He shall, on or before the first day of February, annually, communicate to the commissioners, in writing, a detailed estimate of the receipts and expenditures for the legitimate purposes of the county for the current year, including interest due, and to fall due, on all lawful debts of the county bearing interest. and the commissioners shall, before the 15th day of February thereafter, fix such rate of taxation upon the valuation of the taxable property of the county as will raise a sum sufficient to meet said expenditures."

Here we have the duties of the respective officers clearly stated. The controller was bound to include these judgments among the necessary expenditures. The commissioners were bound to assess a tax sufficient to pay them all. They have no authority to levy and assess two separate and distinct taxes, or "appropriate" any specific portion to be paid out in preference to another. The taxes have no earmark; the five mills and the twenty-seven mills cannot be thus separated and distinguished, the taxes must be assessed from the one general fund when collected in the hands of the treasurer in the order that the drafts are presented to him. After the service of this process the treasurer had no authority to receive county orders of a subsequent date in payment of taxes, and thus divert the funds of the county from the appropriation of them made by law. His countenancing and assisting in a scheme to evade the exigency of these writs, by formation of an association to misappropriate the funds of the county, and hinder them from coming into the treasury, is a disregard of his plain duty and contempt of the process of the court. Whether the provision of the act No. 1 of January 16, 1862 [Laws Pa. 1862, p. 1], requiring the treasurer to receive warrants in payment of taxes, was intended to assist this scheme, concocted and carried into practice by these officers it is unnecessary to inquire. It is a convenient practice, everywhere followed without any legislative authority, but neither the custom nor the law can justify this abuse of it, in order to evade compliance with a legal duty. It is enough to say that this provision was not intended to repeal any of the provisions of the act of 1834, nor can it relieve the treasurer from the proper application of the county funds, in the order of their appropriation as previously made. The provision of the act was wholly superfluous, where it could be obeyed without injury or wrong to third persons, and the court will not construe it as author-

izing officers to evade the performance of their duties and disregard the process of the court. There are many instances in which legislation is obtained, apparently just, which the originators expect to use in a way never contemplated by the legislature. It can have no retroactive effect upon the rights of parties now before the court. Nor could the legislature be presumed to intend by it to aid public officers in an astute scheme to evade the performance of their official duties.

The commissioners' have sent in a statement accounting for the fact that while the five-mill tax, appropriated by them to pay other debts and liabilities of the county, was collected without difficulty, only $900 out of an assessment of over $700,000 could be raised to apply to the payment of the railroad coupons. They admit that the proper estimates were sent to them by the controller, but offer no reason at all for dividing the assessment into two distinct portions,—one of five, the other of twenty-seven mills,—or why this scheme of separate duplicates was now for the first time devised, or, if there were to be separate and several funds in the treasury, and a special tax assessed and appropriated to pay each distinct object of appropriation, why they were not twenty instead of two.

The reasons given for not collecting the twenty-seven mill tax were that it would cost over $100 to make out the duplicate, and they had to advertise for contracts to do it. That the contractors made great delay,—furnished their work in instalments, full of mistakes, which took much time to correct, etc. They deny having entered into any scheme to evade compliance with the exigency of the writ, yet confess to a course of proceeding whose only object could be and was to render the process of this court of no effect. In this course of proceeding the treasurer was clearly in collusion. But I do not see any particular act of the controller, which his duty required, that he has failed to perform. He denies any collusion with the association got up to assist the public officers in the plan contrived not to do what the law imposed on them as a duty. For the present I am willing to accept these excuses, lame as they are, for the past negligence (to use a mild term) of these officers, and to test their sincerity. When this case was argued nine months had passed, and but $900 had been raised, which the commissioners contended was applicable to these judgments. I said to them then, I will suspend acting on these motions till January next. If it be true that you are acting in good faith, you shall have time to collect the tax assessed, as you say, for this purpose. If you have not divided these assessments for the purpose charged, you can demonstrate your assertions by your acts. A more painful duty has seldom been demanded of the court than that which we are now called on to perform. But we cannot evade it, or find a contrivance to not do it, except for a certain time. We shall, therefore, postpone the public decision of this matter till next May term. If, in the meantime, the commissioners and treasurer shall have collected the moneys to satisfy these judgments, the rules will be discharged. This will give ample time to the defendants, and if by that time the money be not paid, or some arrangement be made with the creditors, the court will be compelled to consider it as the settled purpose of these officers to treat the process of the court with contempt, and must act accordingly.

The following is the statement of the county commissioners, referred to by Justice GRIER in the foregoing opinion:

Statement. Addressed to the judges of the circuit court of the United States, and verified under oath before H. Sproul, U. S. commissioner:

"On the first day of February, 1862, the controller, in pursuance of the second section of the act passed the first day of May, 1861 (P. L. p. 451), communicated to the commissioners in writing 'a detailed estimate of the receipts and expenditures for the legitimate purposes of the county for the current year, including interest due and to fall due on all lawful debts of the county bearing interest.' (Copy of estimate submitted.) By this estimate it appeared that the sum $118,977.43 was required for ordinary county purposes, including the interest on the funded debt of the county and exclusive of $51,000 funded debt due and maturing in 1862; that the sum of $745,890 would be required to pay the interest due on bonds issued by the county to certain railroad companies due and maturing in the year 1862, and to the 1st of January, 1863, including a large number of judgments obtained in the United States circuit court on coupons and costs of suit. That previously to the 15th day of February, 1862, the commissioners caused to be levied on the assessed valuation of property made taxable a tax of five mills for ordinary county purposes and interest on the funded debt, producing net $123,000. That, for the purpose of paying the interest on railroad bonds above mentioned, they levied a tax of twenty-seven mills, producing net $746,810. These products (as would be observed) exceed the detailed estimate of the controller, allowance having been made for abatements, exonerations, errors and lost taxes. No provision was made for the payment of the funded debt of the county ($51,000), except in the excess of the product of the five mill tax over the sum of $118,977.43, for the reason that payment of a larger portion of it was not required or desired by the holders. The tax of twenty-seven mills was appropriated exclusively to the payment of railroad interest. The five mill tax was to be applied to the payment of the funded interest and the multifarious objects of county expenditure, as would be seen on reference to appended estimates. There appropriations were made and intended to be made at the time of the levy of the taxes, and the twenty-seven mills tax and the five mills were put into separate books or duplicates, under and by the advice of the county solicitor, F. H. Collier, Esq., whose legal opinion on the subject was taken. That the said commissioners, being forbidden by the 11th section of the act above referred to, to make any contract involving the expenditure of over $100, 'unless with the lowest and best bidder, after due notice to be published by the controller,' advertised for proposals, to make out the duplicates for said taxes, sixty-eight in number; and on the 13th of April, 1862, let the contract for the twenty-seven mills duplicates to Mr. (we omit name by request), he being the lowest and best bidder. (The contract, which was in writing, was attached to this statement.) By the terms of said contract the work was required to be performed on or before the 24th of May following. The contract for the five

mills duplicate was awarded in the same manner. Mr. —— failed to comply with his contract (27 mills duplicates) both as to time and execution. He was repeatedly and earnestly urged to complete the work. He was threatened with forfeiture of his contract, etc. One of the commissioners, Mr. Collins, who resided near the residence of Mr. ——, repeatedly called upon him in regard to the work. He continued to furnish the work in instalments. On inspection it was found to be inaccurate in calculations and many errors were made. The work was found to require careful revision, and much time was expended in rectifying mistakes. Finally an experienced man was employed by the commissioners, at the expense of Mr. ——, to assist in completing the work, which was not accomplished until the 23d of September, when the duplicates, revised and corrected, were passed to the controller, and by him charged and delivered to the treasurer. Mr. —— was found to be incompetent, although reputed fit for the work, and so believed by the undersigned at the time he was employed. The commissioners did not connive at this delay, but were anxious, and did everything they could to hasten the completion of the work. That the undersigned have not been parties to any scheme, device, combination or contrivance for delaying, hindering, or in any way obstructing the holders of coupons or interest warrants of the railroad bonds from obtaining payment of the same, and especially of the judgments obtained in the United States court. That they never had any connection with an association for the purpose of purchasing county warrants, and never did anything directly or indirectly to advance the interest and objects of said association. That they have no knowledge of said association ever purchasing a single warrant; and they are informed and believe that said association did not continue in existence for a longer period than two or three weeks at furthest. That the only knowledge that they ever had of the existence of the association was obtained by reading their advertisements in the newspapers, and handbills, and hearing it spoken of. That although the duplicates for railroad tax were not fully ready until the 24th of September, by reason of the default of Mr. ——, still no real delay was occasioned by it. The treasurer used the books in the commissioners' office for the purpose, and the amount of the tax was calculated at twenty-seven mills on the dollar, and every man had an opportunity of paying his tax, which was paid of the railroad tax was paid as early as the 1st of July, 1862, and all persons were called upon by a public advertisement to pay said tax. That in the year 1861, $74,000 was paid on account of judgments obtained in the United States court on railroad coupons, and in 1862 $26,000 was paid on same account, a portion of which last sum was paid out of the five mill tax levied for 1862. That no warrants have been drawn except for bona fide debts due, and all warrants drawn, amounting to about $66,000, since the 4th of January, 1862, were for ordinary county purposes and the interest of the funded debt, and a part of the funded debt itself. And the undersigned would further submit to your honorable court that they have in good faith, and with honest intention, endeavored to comply with the mandates of your honorable court. They never had and have not now any intent, design or wish to evade the mandamus executions (so called) issued out of your honorable court. Having already paid $100,000 in obedience to special writs of execution, they had made, or thought they had made, abundant provisions for the payment of other executions issued, and all the interest due on said bonds and coupons, and they severally deny, on their oaths, that they have lent themselves to any device, scheme or contrivance of any kind, directly or indirectly, to delay or hinder the execution creditors above men-

tioned. They have discharged, or endeavored and intended to discharge their duties faithfully, according to law, and they submit that the rule to show cause, &c., should be discharged at the cost of the plaintiffs.

"Henry Lambert, Controller.
"Geo. Hamilton,
"David Collins, Comm'rs."